## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

KRIS W. KOBACH, *et al.*,

       *Plaintiffs,*

  vs.

THE UNITED STATES ELECTION
ASSISTANCE COMMISSION, *et al.*,

       *Defendants.*

Case No. 13-cv-4095-EFM-TJJ

## MEMORANDUM AND ORDER

Does the United States Election Assistance Commission ("EAC") have the statutory and constitutional authority to deny a state's request to include its proof-of-citizenship requirement in the state-specific instructions on the federal mail voter registration form? The Plaintiffs—Arizona and Kansas and their secretaries of state—say it does not, and have asked this Court to order the EAC to add the requested language immediately. Because the Court finds that Congress has not preempted state laws requiring proof of citizenship through the National Voter Registration Act, the Court finds the decision of the EAC denying the states' requests to be unlawful and in excess of its statutory authority. Since the Court's decision turns on the plain statutory language, the Court need not resolve the question of whether the Constitution permits the EAC, or Congress, to disregard the states' own determination of what they require to satisfactorily determine citizenship. Therefore, the Court orders the EAC, or the EAC's acting

executive director, to add the language requested by Arizona and Kansas to the state-specific instructions on the federal mail voter registration form, effective immediately.

## I. Factual and Procedural Background

In 2011, the Kansas Legislature amended Kansas Statutes Annotated § 25-2309 to require any person applying to vote provide satisfactory evidence of United States citizenship before becoming registered. In August 2012, Brad Bryant, the Kansas election director, requested that the EAC make three revisions to the national voter registration form's state-specific instructions to reflect changes in Kansas' voter registration law. The third request was for the EAC to provide an instruction to reflect the new proof-of-citizenship requirement that was effective January 1, 2013. In October 2012, Alice Miller—the EAC's acting executive director and chief operating officer—informed Bryant that the EAC would make the first two changes but postponed action on the proof-of-citizenship requirement until a quorum was established on the commission. All four of the EAC's commissioner positions were vacant at the time, and they remain vacant now.

In 2013, a similar proof-of-citizenship requirement under Arizona voter registration law was addressed by the United States Supreme Court. In *Arizona v. Inter Tribal Council of Arizona, Inc.* ("*ITCA*"),[1] the Supreme Court addressed the question of whether an Arizona statute that required state officials to reject a federal voter registration form unaccompanied by documentary evidence of citizenship conflicted with the National Voter Registration Act's mandate that Arizona "accept and use" the federal form.[2] In June 2013, the Supreme Court held that the NVRA precluded Arizona from requiring that anyone registering to vote using the

---

[1] 133 S. Ct. 2247 (U.S. 2013).

[2] *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2254 (U.S. 2013).

federal voter registration form submit information beyond that required by the form itself.[3] In so ruling, the Court concluded, "Arizona may, however, request anew that the EAC include such a requirement among the Federal Form's state-specific instructions, and may seek judicial review of the EAC's decision under the Administrative Procedure Act."[4]

The day after the *ITCA* decision, Kansas Secretary of State Kris Kobach renewed Kansas' request that the EAC include state-specific instructions on the federal form to reflect Kansas' proof-of-citizenship requirement.[5] Two days after the *ITCA* decision, Arizona's Secretary of State, Ken Bennett, made a similar request, asking that the EAC include instructions to reflect Arizona's proof-of-citizenship requirements as outlined in Arizona Revised Statutes Annotated § 16-166(F).[6] In August 2013, Miller informed Kobach and Bennett that the EAC staff was constrained to defer acting on the states' requests until the EAC has a quorum of commissioners.[7] Miller's letters indicated that her decision was based on a 2011 memorandum,

---

[3] *Id. at* 2260.

[4] *Id.*

[5] Doc. 95, at 6. Specifically, Kobach requested the following sentence be added to the instructions: "To cast a regular ballot an applicant must provide evidence of U.S. citizenship prior to the election day." Doc. 95, Exh. 1, at 2.

[6] Doc. 80, at 2-3. Arizona's requested language is more extensive:

"If this is your first time registering to vote in Arizona or you have moved to another county in Arizona, your voter registration form must also include proof of citizenship or the form will be rejected. If you have an Arizona driver license or non-operating identification issued after October 1, 1996, write the number in box 6 on the front of the federal form. This will serve as proof of citizenship and no additional documents are needed. If not, you must attach proof of citizenship to the form. Only one acceptable form of proof is needed to register to vote."

The proposed language then lists five acceptable forms of proof of citizenship, such as birth certificate, passport, naturalization documents, and tribal number or tribal documentation. *Id.*

[7] In August 2013, Georgia made a similar request to change the state-specific instructions to reflect its proof-of-citizenship law passed in 2009. Similarly, Miller informed the Georgia secretary of state that she lacked authority to make the change in the absence of a quorum of commissioners. Doc. 132, Exh. 17, at 57-58. Georgia is not a party to this lawsuit, and its request is not before this Court.

prepared by former EAC executive director Thomas Wilkey, that established an internal procedure to deal with requests to change the state-specific instructions in the absence of a quorum of commissioners. The Wilkey memorandum, which was directed to the EAC staff, stated, "Requests that raise issues of broad policy concern to more than one State will be deferred until the re-establishment of a quorum."[8]

On August 21, 2013, this lawsuit was filed against the EAC and Miller, challenging the EAC's deferral of the states' requests. The Complaint was brought by four plaintiffs—Kobach, Bennett, the State of Kansas, and the State of Arizona. The Plaintiffs sought a writ of mandamus to order the EAC or Miller to modify the state-specific instructions of the federal mail voter registration form to require applicants residing in Kansas and Arizona to submit proof-of-citizenship documents in accordance with Kansas and Arizona law. Similarly, the Plaintiffs asked this Court to enjoin the EAC and its officers from refusing to modify the instructions. The Plaintiffs sought a finding that the EAC's failure to act was agency action unlawfully withheld or unreasonably delayed. Further, the Plaintiffs requested that this Court declare the NVRA unconstitutional as applied and declare that the Wilkey memorandum is an unlawful regulation.

In December 2013, this Court granted four motions for leave to intervene. The first motion was granted to a group that includes the Inter Tribal Council of Arizona, Inc., the Arizona Advocacy Network, the League of United Latin American Citizens of Arizona, and Steve Gallardo. The second motion granted was to Project Vote, Inc. The third motion was granted to the League of Women Voters of the United States, the League of Women Voters of Arizona, and the League of Women Voters of Kansas. The fourth motion was granted to a group

---

[8] Doc. 95, Exh. 1, at 8-9.

that includes Valle del Sol, the Southwest Voter Registration Education Project, Common Cause, Chicanos Por La Causa, Inc., and Debra Lopez. These organizations and individuals, with the exception of the League of Women Voters of Kansas and the League of Women Voters of the United States, were plaintiffs in *ITCA*.[9]

On December 13, 2013, this Court found that there had been no final agency action on the states' requests by the EAC. The Court expressed doubt about the agency's ability to act without commissioners but ordered that the agency be provided with the opportunity to address these matters, including the matter of the agency's ability to make a ruling on this issue. Accordingly, the Court remanded the matter to the EAC with instructions that it render a final agency action no later than January 17, 2014. On that date, Miller issued a 46-page decision purportedly on behalf of the EAC denying the states' requests. The EAC decision concluded, among other things, that the EAC has the authority to determine what is necessary for a state election official to assess the eligibility of those applying to register to vote. Based on this authority, the EAC decision then concluded that requiring an applicant to provide proof of citizenship beyond signing an oath was not necessary for a state election official to assess whether the applicant is a U.S. citizen.

Two weeks later, the Plaintiffs filed a Motion for Judgment asking this Court to review the EAC's decision under the Administrative Procedure Act, issue a writ of mandamus ordering the EAC to make the changes to the instructions, and declare the EAC's denial a violation of the states' constitutional rights. After a status conference, the Court ordered that its review would be limited to the agency record. After oral argument on February 11, 2014, the motion is ripe.

---

[9] Doc. 105, at 3-4.

## II. Legal Standard

Plaintiffs bring this action under the Administrative Procedure Act, which subjects federal agency action to judicial review.[10] Under APA review, the reviewing court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action."[11] The APA gives the reviewing court the authority to compel agency action unlawfully withheld or unreasonably delayed.[12] The only agency action that can be compelled is action legally required.[13] This means that a court is limited to compelling an agency to perform a ministerial or nondiscretionary act, or in other words, a discrete agency action that it is required to take.[14]

The reviewing court also has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) contrary to constitutional right, power, privilege, or immunity;
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> (D) without observance of procedure required by law;
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court."[15]

---

[10] 5 U.S.C. § 706; *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573 (10th Cir. 1994).

[11] 5 U.S.C. § 706.

[12] 5 U.S.C. § 706(1).

[13] *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004).

[14] *Id.* at 64.

[15] 5 U.S.C. § 706(2).

The Court must review the entire administrative record or those parts of it cited by a party, and due account must be taken of the rule of prejudicial error.[16] If the agency action is upheld, it must be upheld for the reasons articulated by the agency.[17] Ordinarily, the APA standard of review is a deferential one, but courts do not afford any deference to an agency interpretation that is clearly wrong or where Congress has not delegated administrative authority to the agency on the particular issue.[18]

## III. Analysis

As an initial matter, the Court is skeptical that Miller has authority to make this decision for the EAC. The Court notes that Miller herself initially thought that she couldn't make this decision and informed the states in her letters that whether to add the instructions was a policy question that must be decided by the EAC commissioners.[19] However, the Court finds it unnecessary to address Miller's authority to act as acting executive director because the Court's decision would be the same if a full commission had voted 4-0 to deny the states' requests. For the purposes of the following analysis, the Court assumes—without deciding—that Miller is authorized to make the decision on behalf of the EAC.

This Court's review of the EAC's decision to deny the states' requests to change the instructions of the federal form hinges on the answer to two questions. First, does Congress have the constitutional authority to preempt state voter registration requirements? And, if so, has Congress exercised that authority to do so under the National Voter Registration Act?

---

[16] 5 U.S.C. § 706(2).

[17] *See Cherokee Nation of Oklahoma v. Norton*, 389 F.3d 1074, 1078 (10th Cir. 2004).

[18] *Mission Group Kansas, Inc. v. Spellings*, 515 F. Supp. 2d 1232, 1235 (D. Kan. 2007).

[19] Doc. 80, Exh. 1, at 1; Doc. 95, Exh. 1, at 1, 6.

## A. Constitutional framework

The Constitution gives each state exclusive authority to determine the qualifications of voters for state and federal elections.[20] Article I, section 2, clause 1—often called the Qualifications Clause—provides that the voters for the U.S. House of Representatives in each state shall have the same qualifications required for voters of the largest branch of the state legislature.[21] The Seventeenth Amendment adopts the same requirement for voters for the U.S. Senate.[22] The U.S. Supreme Court has read these provisions to conclude that the states, not Congress, set the voter qualifications for federal elections.[23]

But the Constitution does give Congress the power to regulate how federal elections are held.[24] Article I, section 4, clause 1—often called the Elections Clause—provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."[25]

In other words, the States have the initial authority to determine the time, place, and manner of holding federal elections, but Congress has the power to alter those regulations or

---

[20] *ITCA*, 133 S. Ct. at 2257-58.

[21] U.S. Const. art. I, § 2, cl. 2 ("The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.").

[22] U.S. Const. amend XVII, cl. 2 ("The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.").

[23] *ITCA*, 133 S. Ct. at 2258.

[24] *Id.* at 2257.

[25] U.S. Const. art. I, § 4, cl. 1.

supplant them altogether.[26] In practice, this means that the States are responsible for the mechanics of federal elections, but only so far as Congress chooses not to preempt state legislative choices.[27] In *ITCA*, the U.S. Supreme Court stated that the scope of the Elections Clause is broad, noting "'Times, Places, and Manner,' we have written, are 'comprehensive words,' which 'embrace authority to provide a complete code for congressional elections,' including, as relevant here and as petitioners do not contest, regulations relating to 'registration.'"[28]

*ITCA* decided, among other things, that Congress has the power to regulate voter registration and that Congress exercised that power through the NVRA. In *ITCA*, the issue was whether federal law preempted Arizona law on how the federal voter registration form was to be treated by state election officials.[29] The NVRA provided that each state must "accept and use" the federal mail voter registration form.[30] Meanwhile, Arizona law specified that a county election official must "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship."[31] Specifically, *ITCA* decided that the NVRA's "accept and use" provision preempted Arizona's requirement that an election official must "reject" a federal form without proof of citizenship.[32] Therefore, *ITCA* validates Congress'

---

[26] *ITCA*, 133 S. Ct. at 2253.

[27] *Id.*

[28] *Id.* (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)).

[29] *Id.* at 2254 ("The straightforward textual question here is whether Ariz. Rev. Stat. Ann. § 16-166(F), which requires state officials to 'reject' a Federal Form unaccompanied by documentary evidence of citizenship, conflicts with the NVRA's mandate that Arizona 'accept and use' the Federal Form.").

[30] 42 U.S.C. § 1973gg-4(a)(1).

[31] Ariz. Rev. Stat. Ann. § 16-166(F).

[32] *ITCA*, 133 S. Ct. at 2260.

power to regulate voter registration under its broad authority to regulate the manner of holding elections.

But *ITCA* also strongly indicated that this broad power is not unlimited. The opinion emphasizes that "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them."[33] Indeed, as all parties here concede, nothing in the Elections Clause "lends itself to the view that voting qualifications in federal elections are to be set by Congress."[34] The Court concluded, "Since the power to establish voting requirements is of little value without the power to enforce those requirements, Arizona is correct that it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications."[35] On this point, the Court was unanimous.[36] In other words, the States' exclusive constitutional authority to set voter qualifications necessarily includes the power to enforce those qualifications.[37]

---

[33] *Id*. at 2257.

[34] *Id*. at 2258.

[35] *Id*. at 2258-59.

[36] *See id*. at 2264 (Thomas, J., dissenting) ("For this reason, the Voter Qualifications Clause gives States the authority not only to set qualifications but also the power to verify whether those qualifications are satisfied."); *id*. at 2273 (Alito, J., dissenting) (noting that "the Constitution reserves for the States the power to decide who is qualified to vote in federal elections" and that "a federal law that frustrates a State's ability to enforce its voter qualifications would be constitutionally suspect").

[37] *But see Smiley*, 285 U.S. at 366. The Court provided more explanation in *Smiley*:

The subject-matter is the 'times, places and manner of holding elections for senators and representatives.' It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved. And these requirements would be nugatory if they did not have appropriate sanctions in the definition of offenses and punishments. All this is comprised in the subject of 'times, places

This premise suggests that Congress has no authority to preempt a State's power to enforce its voter qualifications. The *ITCA* opinion stops short of making this declaration, choosing to avoid resolving this constitutional question because of Arizona's ability to renew its request to change the instructions on the federal form and pursue this action.[38] But there are indications in the opinion and in oral argument that imply that state authority may have prevailed if the Court had been forced to resolve this constitutional question.[39] In the *ITCA* opinion, the Court acknowledged that "serious constitutional doubts" would be raised if the NVRA precluded Arizona "from obtaining the information necessary to enforce its voter qualifications."[40] Then, the Court referred to this action challenging the EAC's denial of Arizona's request as an "alternative means of enforcing its constitutional power to determine voter qualifications."[41] The Court also suggested that Arizona may have "a constitutional right to demand concrete evidence

and manner of holding elections,' and involves lawmaking in its essential features and more important aspect.

This passage could be read to stand for the idea that the "manner of holding elections" is comprehensive enough to include the power to enforce voter qualifications, which could be regulated by Congress. But as Justice Thomas points out, and the parties concede, this passage is dicta. See *ITCA*, 133 S. Ct. at 2268 (Thomas, J., dissenting). In any event, the majority opinion deliberately did not include this passage from *Smiley*, other than to acknowledge that voter registration is included within the broad scope of the Elections Clause. *See id*. at 2253 (majority opinion).

[38] See *ITCA*, 133 S. Ct. at 2259 ("Happily, we are spared that necessity, since the statute provides another means by which Arizona may obtain information needed for enforcement.").

[39] At oral argument, Justice Scalia, who authored the majority opinion in *ITCA*, expressed concern multiple times about Arizona's failure to challenge the EAC's 2-2 vote in 2005 that resulted in no action being taken on Arizona's initial request to add identical proof-of-citizenship language. Transcript of Oral Argument at 9, 11, 15-16, 18, *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247 (2013) (No. 12-71). Justice Scalia expressed skepticism about how the EAC would fare in such a challenge under the APA. *Id*. at 56-57 ("So you're going to be—in bad shape—the government is going to be—the next time somebody does challenge the Commission determination in court under the Administrative Procedure Act.").

[40] *ITCA,* 133 S. Ct. at 2258-59.

[41] *Id*. at 2259.

of citizenship apart from the Federal Form."[42] These statements intimate that the Court may have declared the NVRA's "accept and use" provision unconstitutional if Arizona had exhausted its administrative remedies through the EAC. By denying the states' request to update the instructions on the federal form, the EAC effectively strips state election officials of the power to enforce the states' voter eligibility requirements. Thus, the EAC decision has the effect of regulating *who* may vote in federal elections—which *ITCA* held that Congress may not do.[43]

On one hand, the *ITCA* decision acknowledges the broad scope of Congress' power under the Elections Clause, which includes the authority of the NVRA to preempt state law regarding voter registration. But the *ITCA* opinion also emphasizes the States' exclusive constitutional authority to set voter qualifications—which Congress may not preempt—and appears to tie that authority with the power of the States to enforce their qualifications. Ultimately, the *ITCA* opinion avoids definitively answering this constitutional question in favor of allowing Arizona to pursue the course of action leading to this lawsuit. Similarly, this Court also finds that it need not answer the question of whether Congress may constitutionally preempt state laws regarding proof of eligibility to vote in elections. Answering this constitutional question is unnecessary because the Court finds in the next section that Congress has not attempted to preempt state laws requiring proof of citizenship through the text of the NVRA.

## B. Statutory framework

If the Court found that Congress had preempted state law regarding the procedure for determining qualifications for voter registration through the NVRA, serious constitutional

---

[42] *Id*. at 2260 n.10.

[43] *Id*. at 2257 ("Arizona is correct that the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them.").

questions about Congress' authority to do so would have to be addressed.[44] As noted above, one question is whether the scope of the Elections Clause is broad enough to give Congress the authority to regulate voter registration. If that question were answered in the affirmative, which *ITCA* did, a second question arises of whether such congressional authority could be exercised by delegating authority to the EAC to decide what may or may not be included on the state-specific instructions of the federal form. In *ITCA*, the U.S. Supreme Court declined to definitively answer this second question but declared that serious constitutional doubts exist.[45] Instead, the Court suggested that Arizona could make another request and pursue this lawsuit if that request were denied.[46] That is the procedural posture presented to this Court today. This action for review of agency action was brought after the EAC acting executive director declined to make the changes requested by Arizona and Kansas.

However, this Court concludes that it does not need to answer the constitutional question either. The U.S. Supreme Court has advised that " '[I]t is a cardinal principle' of statutory interpretation, however, that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'"[47] Where possible, this Court will construe a federal statute to avoid serious constitutional doubt.[48] That means, "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of

---

[44] *Id*. at 2258-59.

[45] *Id*.

[46] *Id*. at 2259-60.

[47] *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

[48] *See Stern v. Marshall*, 131 S. Ct. 2594, 2605 (U.S. 2011).

its choice. If one of them would raise a multitude of constitutional problems, the other should prevail."[49] The prevailing interpretation, however, may not be "plainly contrary to the intent of Congress."[50] This canon of constitutional avoidance in statutory interpretation is based on the reasonable presumption that Congress did not intend to enact a statute that raises serious constitutional doubts.[51] Thus, this Court's duty is to adopt the construction that avoids doubtful constitutional questions.[52]

In *ITCA*, the Court concluded, "Since the power to establish voting requirements is of little value without the power to enforce those requirements, Arizona is correct that it would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications."[53] Here, the EAC's decision to deny the states' requested instructions has precluded the states from obtaining proof of citizenship that the states have deemed necessary to enforce voter qualifications. Therefore, the EAC's interpretation of the NVRA raises the same serious constitutional doubts as expressed in *ITCA*.

The canon of constitutional avoidance also comes into play as this Court considers the degree of deference to give the EAC decision. Normally, courts may owe deference—often referred to as *Chevron* deference—to an agency's construction of a statute that it administers when the statute is silent or ambiguous on the issue in question and the agency's reading is a

---

[49] *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005); *see also Almendarez-Torres v. U.S.*, 523 U.S. 224, 238 (1998) ("Thus, those who invoke the doctrine must believe that the alternative is a serious likelihood that the statute will be held unconstitutional."); *U.S. v. La Franca*, 282 U.S. 568, 574 (1931) ("The decisions of this court are uniformly to the effect that 'A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.'").

[50] *Miller v. French*, 530 U.S. 327, 341 (2000).

[51] *Clark*, 543 U.S. at 381.

[52] *Jones v. U.S.*, 529 U.S. 848, 857 (2000).

[53] *ITCA*, 133 S. Ct. at 2258-59.

"permissible construction of the statute."[54] But when an administrative interpretation of a statute invokes the outer limits of congressional power, there should be a clear indication that Congress intended that result.[55] The assumption that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority is heightened if the agency's interpretation alters the federal-state framework by permitting federal encroachment on a traditional state power.[56]

Circuit courts have concluded that the canon of constitutional avoidance trumps *Chevron* deference owed to an agency's interpretation of a statute.[57] This conclusion has been held to be true in the context of federal election law.[58] Here, the U.S. Supreme Court has indicated that an interpretation of the NVRA that keeps a state from obtaining the information necessary to enforce its voter qualifications raises "serious constitutional doubts."[59] Such an interpretation alters the federal-state framework by permitting federal encroachment on the traditional state

---

[54] *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1244 (10th Cir. 2008) (quoting *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

[55] *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172 (2001).

[56] *Id.* at 173; *Rapanos v. U.S.*, 547 U.S. 715, 738 (2006) ("We ordinarily expect a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority.").

[57] *See, e.g., Hernandez-Carrera*, 547 F.3d at 1249 ("It is well established that the canon of constitutional avoidance does constrain an agency's discretion to interpret statutory ambiguities, even when *Chevron* deference would otherwise be due."); *Union Pacific Railroad Company v. United States Department of Homeland Security*, 738 F.3d 885, 893 (8th Cir. 2013) ("Constitutional avoidance trumps even *Chevron* deference, and easily outweighs any lesser form of deference we might ordinarily afford an administrative agency."); *Rural Cellular Ass'n v. F.C.C.*, 685 F.3d 1083, 1090 (D.C. Cir. 2012) ("Because the 'canon of constitutional avoidance trumps *Chevron* deference, we will not accept the Commission's interpretation of an ambiguous statutory phrase if that interpretation raises a serious constitutional difficulty.") (citation omitted); *Kim Ho Ma v. Ashcroft*, 257 F.3d 1095, 1105 n.15 (9th Cir. 2001) ("*Chevron* principles are not applicable where a substantial constitutional question is raised by an agency's interpretation of a statute it is authorized to construe.").

[58] See *Chamber of Commerce of U.S. v. Federal Election Com'n*, 69 F.3d 600, 605 (D.C. Cir. 1995) (holding that FEC was not entitled to *Chevron* deference with regard to its interpretation of the Federal Election Campaign Act because the FEC's interpretation of statutory language raised "serious constitutional difficulties").

[59] *ITCA*, 133 S. Ct. at 2258-59.

power to establish and enforce voting requirements.[60] And critically, the NVRA lacks a "clear and manifest" statement that Congress intends to intrude into the states' authority to enforce voting requirements or even that the EAC has broad discretion to decide what goes in the state-specific instructions.[61] Therefore, the Court finds that the EAC decision is not entitled to *Chevron* deference in this case.

As noted earlier, when a federal statute raises serious constitutional doubts, then this Court first must determine whether a construction of the statute is fairly possible to avoid the constitutional question. Here, this Court need not resolve the constitutional question because Congress has not clearly exercised its preemption power on this issue, even assuming it has preemption power on this issue, in the NVRA. The text of the NVRA provides: "The Election Assistance Commission—in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office."[62] The statute also allows the EAC to prescribe regulations necessary to carry out this provision, again "in consultation with the chief election officers of the States."[63] As a result, the EAC has adopted the following regulation concerning the state-specific instructions at issue here: "The state-specific instructions shall contain the following information for each state, arranged by state: the address where the application should be mailed and *information regarding the state's specific voter eligibility and registration requirements*."[64]

---

[60] *See Solid Waste*, 531 U.S. at 172.

[61] *See Rapanos*, 547 U.S. at 738.

[62] 42 U.S.C. § 1973gg-7(a)(2).

[63] 42 U.S.C. § 1973gg-7(a)(1).

[64] 11 C.F.R. § 9428.3(b) (emphasis added).

The NVRA includes the following provisions concerning the contents of the mail voter registration form:

> The mail voter registration form developed under subsection (a)(2) of this section—
> (1) may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process;
> (2) shall include a statement that—
> > (A) specifies each eligibility requirement (including citizenship);
> > (B) contains an attestation that the applicant meets each such requirement; and
> > (C) requires the signature of the applicant, under penalty of perjury;
> (3) may not include any requirement for notarization or other form authentication."[65]

Again, the question here is whether these provisions of the NVRA preempt Arizona and Kansas laws that require that residents applying to vote provide documentary proof of U.S. citizenship as part of the voter registration process. In *Gonzalez v. Arizona*, which was affirmed by *ITCA*, the Ninth Circuit provided a test to determine whether federal law preempts state law under the Elections Clause.[66] The U.S. Supreme Court neither adopted nor rejected the Ninth Circuit's test in *ITCA*, but this Court finds it useful here.

Highly summarized, the Ninth Circuit examined U.S. Supreme Court precedent in *Ex Parte Siebold*[67] and *Foster v. Love*[68] addressing Elections Clause preemption.[69] In finding there

---

[65] 42 U.S.C. § 1973gg-7(b).

[66] 677 F.3d 383, 393-94 (9th Cir. 2012).

[67] 100 U.S. 371 (1879).

[68] 522 U.S. 67 (1997).

[69] *Gonzalez,* 677 F.3d at 393-94.

is no presumption against preemption under the Elections Clause, the Ninth Circuit noted that in *Siebold* the Court compared the relationship between state and federal election laws to prior and subsequent laws passed by the same legislature.[70] In that way, a state law—like a prior existing law—is allowed to stand if a federal law—like a subsequently passed law—does not alter it.[71] The Ninth Circuit also noted that *Foster* clarified what constitutes a conflict between state and federal law under the Elections Clause.[72] The Ninth Circuit then articulated the following test:

> Reading *Siebold* and *Foster* together, we derive the following approach for determining whether federal enactments under the Elections Clause displace a state's procedures for conducting federal elections. First, as suggested in *Siebold*, we consider the state and federal laws as if they comprise a single system of federal election procedures. If the state law complements the congressional procedural scheme, we treat it as if it were adopted by Congress as part of that scheme. If Congress addressed the same subject as the state law, we consider whether the federal act has superseded the state act, based on a natural reading of the two laws and viewing the federal act as if it were a subsequent enactment by the same legislature. If the two statutes do not operate harmoniously in a single procedural scheme for federal voter registration, then Congress has exercised its power to "alter" the state's regulation, and that regulation is superseded.[73]

In *Gonzalez*, the Ninth Circuit considered the conflict between the NVRA's "accept and use" provision and Arizona's requirement to "reject any application" without documentary proof of citizenship.[74] The Ninth Circuit concluded that the two laws covered the same subject matter and did not operate harmoniously when read together naturally. As a result, the Ninth Circuit

---

[70] *Id*. at 393.

[71] *Id*.

[72] *Id*.

[73] *Id*. at 394 (Citations omitted).

[74] *Id*. at 398.

concluded that Arizona's law was preempted by the NVRA, as applied to the federal form, under Congress' power under the Elections Clause.[75] This result was affirmed by *ITCA*.[76]

Here, it is not as clear which provisions of Arizona and Kansas law and the NVRA are alleged to be in conflict. The EAC decision enumerated nine reasons to deny the states' requests but didn't directly address preemption other than to restate that *ITCA* was decided based on preemption.[77] Here, Arizona law states that "[t]he county recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship."[78] Similarly, Kansas law states that "[t]he county election officer or secretary of state's office shall accept any completed application for registration, but an applicant shall not be registered until the applicant has provided satisfactory evidence of United States citizenship."[79] Both statutes list evidence that would satisfy the proof-of-citizenship requirements.[80] In *ITCA*, the question was whether the Arizona law conflicted with the NVRA's requirement that the states "accept and use" the federal form, and the answer was yes.[81]

In this case, the Court considers the question of whether there is a conflict between state and federal law as it pertains to adding information to the federal form's state-specific

---

[75] *Id*. at 403.

[76] *ITCA*, 133 S. Ct. at 2260.

[77] Memorandum of Decision, Doc. 129, Exh. 1, at 24-25.

[78] Ariz. Rev. Stat. Ann. § 16-166(F).

[79] Kan. Stat. Ann. § 25-2309(l).

[80] Ariz. Rev. Stat. Ann. § 16-166(F)(1)-(6); Kan. Stat. Ann. § 25-2309(l)(1)-(13). In Arizona, satisfactory evidence includes a driver's license or state-issued identification, birth certificate, passport, naturalization documents, or tribal number. The Kansas statute lists the same evidence plus other documents that indicate place of birth or citizenship such as adoption records, military records, and hospital records.

[81] *ITCA*, 133 S. Ct. at 2260.

instructions. First, the Court considers the state and federal laws together as one system of federal election procedures.[82] Then the Court determines whether the state laws complement or conflict with the NVRA.[83] A conflict exists only if the state and federal law cannot coexist.[84] To make this determination, the Court considers whether the NVRA addresses the same subject as the state laws.[85] Ultimately, the Court may find that the NVRA supersedes state law if they do not operate harmoniously in one procedural scheme.[86] For the immediate purpose of making this comparison, the Court is setting aside the question of whether the Congress constitutionally can supersede state law on this narrow issue.

It is clear that the text of the NVRA does not addresses the same subject as the states' laws—documentary proof of citizenship. In fact, Miller's August 2013 letter to Kobach deferring action states that "citizenship documentation is not addressed in the National Voter Registration Act of 1993 or the Help America Vote Act of 2002 and the inclusion of such information with the Federal Form as it is currently designed constitutes a policy question which EAC Commissioners must decide."[87] The statute requires the applicant's signature that attests that the applicant meets each eligibility requirement, including citizenship.[88] Notably, the NVRA

---

[82] *See Gonzalez*, 677 F.3d at 394.

[83] *Id.*

[84] *See Siebold*, 100 U.S. at 386 ("The regulations of Congress being constitutionally paramount, the duties imposed thereby upon the officers of the United States, so far as they have respect to the same matters, must necessarily be paramount to those to be performed by the officers of the State. If both cannot be performed, the latter are *pro tanto* superseded and cease to be duties.").

[85] *See Gonzalez*, 677 F.3d at 394.

[86] *Id.*

[87] Doc. 95, Exh. 1, at 6-7.

[88] 42 U.S.C. § 1973gg-7(b)(2)(A)-(C).

expressly prohibits the notarization or other formal authentication of the applicant's signature.[89]

So if a state would decide to require a notarized signature on either a state or federal voter registration form, that state law would be preempted by the clear text of the NVRA as it pertains to federal elections.[90] In turn, that means that the EAC would have statutory authority to deny a state's request to include a notarization requirement in the state-specific instructions.

But the NVRA does not include a similar clear and manifest prohibition against a state requiring documentary proof of citizenship.[91] In fact, the NVRA does not address documentary proof of citizenship at all, neither allowing it nor prohibiting it.[92] Therefore, the Court must find that the NVRA is silent on the subject. Because Congress has not addressed the same subject as the state law, there is no basis to determine that the NVRA has preempted Arizona or Kansas law

---

[89] 42 U.S.C. § 1973gg-7(b)(3) ("The mail voter registration form developed under subsection (a)(2) of this section—may not include any requirement for notarization or other formal authentication.").

[90] See 42 U.S.C. § 1973gg-4(a)(2) ("In addition to accepting and using the [federal mail voter registration form], a State may develop and use a mail voter registration form that meets all of the criteria stated in section 1973gg-7(b) of this title for the registration of voters in elections for Federal office."). Because the notarization prohibition is included among the criteria in Section 1973gg-7(b), even a state-developed form could not include a notarization requirement and be used to register an applicant for federal elections.

[91] The Court acknowledges that the EAC decision contains a footnote noting that the NVRA prohibits "formal authentication" and that requiring additional proof of citizenship would be "tantamount to requiring 'formal authentication' of an individual's voter registration application." Memorandum of Decision, Doc. 129, Exh. 1, at 21 n.9. The Court rejects this suggested interpretation. As noted above, the Court reads the statute in the context of prohibiting formal authentication of the applicant's signature.

[92] The EAC decision considered the NVRA's legislative history to be a significant factor in justifying denial, finding that Congress considered and rejected proof-of-citizenship requirements when enacting the NVRA in 1993. Memorandum of Decision, Doc. 129, Exh. 1, at 20-21. According to the EAC decision, Congress considered including language that would allow states to require documentary evidence of citizenship (a requirement that no state had at the time) and decided not to include such language in the NVRA. *Id*. at 20. In its motion, the Plaintiffs point to other parts of the legislative history that purport to show that the NVRA's sponsor argued that the proposed language was unnecessary as redundant because nothing in the NVRA prevented a state from requiring proof of citizenship. Doc. 140, at 8-9. Either way, the Court is not impressed with the legislative history presented in the absence of statutory language addressing the subject. See *U.S. v. Cheever*, 423 F. Supp. 2d 1181, 1191 (D. Kan. 2006) (noting that "it can be a dangerous proposition to interpret a statute by what it does *not* say" and that "[s]uch a negative inference is a weak indicator of legislative intent."). The Court finds it unnecessary to consider the legislative history here. *See Shannon v. U.S.*, 512 U.S. 573, 583 (1994) (noting that courts have no authority to enforce a principle gleaned solely from legislative history that has no statutory reference point).

on the subject of documentary proof of citizenship. If the federal and state laws operate harmoniously in one scheme for federal voter registration, then Congress has not exercised its power to alter state law under the Elections Clause.[93] If that is the case, state and federal law may coexist.[94]

The better question here, then, is whether the text of the NVRA authorizes the EAC to deny a state's request to list its statutory registration requirement on the federal form's state-specific instructions. The NVRA authorizes the EAC to "develop" the federal form and contemplates cooperation with state officials to do so.[95] Similarly, the NVRA authorizes the EAC to "prescribe such regulations as are necessary" to develop the form, again, "in consultation with the chief election officers of the States."[96]

The state-specific instructions at issue here are authorized by such a regulation.[97] The regulation describes the mandatory contents of the instructions: "The state-specific instructions shall contain the following information for each state, arranged by state: the address where the application should be mailed and information regarding the state's specific voter eligibility and registration requirements."[98] The regulations contemplate that a state may have additional

---

[93] See *Siebold*, 100 U.S. at 384 ("There is not the slightest difficulty in a harmonious combination into one system of the regulations made by the two sovereignties, any more than there is in the case of prior and subsequent enactments of the same legislature."); *see also Gonzalez*, 677 F.3d at 394.

[94] *See Siebold*, 100 U.S. at 383 ("If it only alters, leaving, as manifest convenience requires, the general organization of the polls to the State, there results a necessary co-operation of the two governments in regulating the subject.").

[95] 42 U.S.C. § 1973gg-7(a)(2) ("The Election Assistance Commission—in consultation with the chief election officers of the States, shall develop a mail voter registration application form for elections for Federal office.").

[96] 42 U.S.C. § 1973gg-7(a)(1).

[97] 11 C.F.R. § 9428.3(a).

[98] 11 C.F.R. § 9428.3(b).

eligibility requirements that must be listed in the instructions. The regulation dictates that the form shall also: "(1) Specify each eligibility requirement (including citizenship). The application shall list U.S. Citizenship as a universal eligibility requirement and include a statement that incorporates by reference each state's specific additional eligibility requirements (including any special pledges) as set forth in the accompany state instructions."[99] The regulations also address the mechanics of how the EAC acquires each state's specific voter eligibility information and registration requirements from state election officials:

> (a) Each chief state election official shall certify to the Commission within 30 days after July 25, 1994:
> (1) All voter registration eligibility requirements of that state and their corresponding state constitution or statutory citations, including *but not limited to* the specific state requirements, if any, relating to minimum age, length of residence, reasons to disenfranchise such as criminal conviction or mental incompetence, and whether the state is closed primary state.
> . . .
> (c) Each chief state election official shall notify the Commission, in writing, within 30 days of any change to the state's voter eligibility requirements or other information reported under this section."[100]

A natural reading of the regulations suggests that the EAC anticipated that a state may change its voter eligibility requirements and outlined a procedure for the state's chief election official to notify the EAC of any such change. And under 11 C.F.R. § 9428.3(b), the state-specific instructions must contain each state's specific voter eligibility and registration requirements. Notably, the regulations require a state election official to "notify" the EAC of any change. The regulations do not require the state official to "request" that the EAC change the

---

[99] 11 C.F.R. § 9428.4(b)(1). Alabama, Florida, and Vermont require that the applicant swear or affirm an oath containing specific language. State Instructions, Doc. 95, Exh. 4, at 3, 6, 18. Louisiana requires that documentary proof of the applicant's name and address must be attached if the applicant does not have a driver's license, identification card, or social security number. State Instructions, Doc. 95, Exh. 4, at 9.

[100] 11 C.F.R. § 9428.6(a), (c) (emphasis added).

instructions, and the regulations are silent as to the discretion, if any, that the EAC has to decline to make changes to the state-specific instructions.[101] Therefore, naturally reading these regulations together suggests that 1) a state may have additional voter eligibility requirements, 2) a state must inform the EAC of its voter eligibility requirements, and 3) the EAC must list those requirements in the state-specific instructions.[102] This scheme suggests that state and federal laws can coexist, thus there is no conflict. And if there is no conflict, there is no preemption.

The NVRA, in Section 1973gg-7(b)(1), mandates that the federal form "may require only such" information "as is necessary to enable the appropriate State election official to assess the eligibility of the applicant."[103] In other words, the federal form may not require unnecessary information. For example, the Federal Election Commission—the EAC's predecessor—considered but excluded from the federal form requests for information deemed unnecessary to assess voter eligibility such as occupation, physical characteristics, and marital status.[104] In *ITCA*, the U.S. Supreme Court noted that Section 1973gg-7(b)(1) "acts as both a ceiling and a floor with respect to the contents of the Federal Form," and concluded that necessary information

---

[101] The EAC decision recognizes that "[n]either the NVRA nor the EAC regulations specifically provide a procedure for states to request changes to the Federal Form." Memorandum of Decision, Doc. 129, Exh. 1, at 13. The EAC decision also acknowledges the states' duty to notify the EAC of changes but concludes, "The regulations leave it solely to the EAC's discretion whether and how to incorporate these changes." *Id.* However, there is no discretionary language in the regulations supporting this conclusion. Notably, the administrative record includes a public comment from a former commissioner of the Federal Election Commission (the predecessor agency to the EAC) who opined that "the EAC has no authority to refuse to approve state-specific instructions that deal with the eligibility and qualifications of voters." Doc. 132, Exh. 5, at 13-17.

[102] 11 C.F.R. § 9428.6(c); 11 C.F.R. § 9428.3(b). As noted earlier, there is one limited exception. The EAC would not be obligated to list a state's notarization requirement in the instructions because the NVRA expressly prohibits notarization, preempting any potential change in state law on the subject. 42 U.S.C. § 1973gg-7(b)(3).

[103] 42 U.S.C. § 1973gg-7(b)(1).

[104] 59 Fed. Reg. 32311, 32316-17 (1994).

that *may* be required *will* be required.[105] Thus, a natural reading of the statute suggests that a state election official maintains the authority to assess voter eligibility and that the federal form will require the information necessary for the official to make that determination. This leads to the conclusion that, consistent with the determination of both states' legislatures, proof of citizenship is necessary to enable Arizona and Kansas election officials to assess the eligibility of applicants under their states' laws.

In contrast, the EAC decision concludes that proof of citizenship, beyond signing the form, is not necessary for state election officials to assess the eligibility of applicants.[106] The EAC determined that it has discretionary authority to decide what information will be on the federal form and its instructions because of the NVRA's language that the EAC's duty is to "develop" the federal form.[107] As a result, the EAC decision concludes that the federal form already provides all that is necessary for state officials to assess eligibility and that the states' proposed instructions will require more information than is necessary.[108]

The EAC decision asserts that the EAC has the discretionary authority to determine whether the requests to change the instructions are necessary to enable the states to assess voter eligibility. The EAC decision does not cite the NVRA or its regulations in baldly stating:

> We conclude that the States' contention that the EAC is under a nondiscretionary duty to grant their requests is incorrect. Rather, as the Court explained in *Inter Tribal Council*, the EAC is obligated to grant such requests only if it determines, based on the evidence in the record, that it is necessary to do so in order to enable state election officials to enforce their states' voter qualifications. If the States can

---

[105] *ITCA*, 133 S. Ct. at 2259.

[106] Memorandum of Decision, Doc. 129, Exh. 1, at 28-41.

[107] *Id*. at 13.

[108] *Id*. at 28-31.

enforce their citizenship requirements without additional proof-of-citizenship instructions, denial of their requests for such instructions does not raise any constitutional doubts.[109]

The EAC decision provides no citation or analysis of how *ITCA* leads to Miller's conclusion that the EAC has the authority to decide what is necessary. Nor is there express language in the NVRA or in the *ITCA* opinion granting the EAC such broad authority to determine what information is necessary for a state official to enforce voter qualifications. Again, a natural reading of the statute in question supports the conclusion that state election officials maintain authority to determine voter eligibility. In *ITCA*, the Court characterizes proof of citizenship as "information the State deems necessary to determine eligibility."[110] As a result, the EAC's declaration that it alone has the authority to determine what is deemed necessary information is without legal support and is incorrect.

Further, the U.S. Supreme Court characterizes the EAC as having "a nondiscretionary duty" to include Arizona's proof-of-citizenship requirement in the instructions if Arizona can establish in this Court "that a mere oath will not suffice to effectuate its citizenship requirement."[111] So, at the least, the *ITCA* opinion establishes that there is a point at which the EAC loses whatever discretion it possesses to determine the contents of the state-specific instructions.

---

[109] *Id.* at 27.

[110] *ITCA*, 133 S. Ct. at 2259 ("Since, pursuant to the Government's concession, a State may request that the EAC alter the Federal Form to include information the State deems necessary to determine eligibility, and may challenge the EAC's rejection of that request in a suit under the Administrative Procedure Act, no constitutional doubt is raised by giving the 'accept and use' provision of the NVRA its fairest reading.") (citations omitted).

[111] *Id.* at 2260 ("Should the EAC's inaction persist, Arizona would have the opportunity to establish in a reviewing court that a mere oath will not suffice to effectuate its citizenship requirement and that the EAC is therefore under a nondiscretionary duty to include Arizona's concrete evidence requirement on the Federal Form.").

Here, Arizona and Kansas have established that their state laws require their election officials to assess the eligibility of voters by examining proof of their U.S. citizenship beyond a mere oath. The EAC decision makes the case that the states have other means available to enforce the citizenship requirement.[112] But the Arizona and Kansas legislatures have decided that a mere oath is not sufficient to effectuate their citizenship requirements and that concrete proof of citizenship is required to register to vote. Because the Constitution gives the states exclusive authority to set voter qualifications under the Qualifications Clause, and because no clear congressional enactment attempts to preempt this authority, the Court finds that the states' determination that a mere oath is not sufficient is all the states are required to establish.

Therefore, the Court finds that Congress has not preempted state laws requiring proof of citizenship through the NVRA. This interpretation is not "plainly contrary to the intent of Congress" because the NVRA is silent as to the issue.[113] Consistent with *ITCA*, because the states have established that a mere oath will not suffice to effectuate their citizenship requirement, "the EAC is therefore under a nondiscretionary duty" to include the states' concrete evidence requirement in the state-specific instructions on the federal form.[114]

### C. The EAC Decision Constitutes Agency Action Unlawfully Withheld

As a result, the EAC's nondiscretionary duty is to perform the ministerial function of updating the instructions to reflect each state's laws. Accordingly, the Court finds that the EAC's refusal to perform its nondiscretionary duty to change the instructions as required constitutes

---

[112] Memorandum of Decision, Doc. 129, Exh. 1, at 36-41.

[113] *See Miller*, 530 U.S. at 341.

[114] *See ITCA*, 133 S. Ct. at 2260.

agency action unlawfully withheld.[115] The Court orders the EAC to add the language requested by Arizona and Kansas to the state-specific instructions of the federal mail voter registration form immediately.

Because the Court has declined to reach the constitutional question, the Court denies the Plaintiffs' requests to declare that the states' constitutional rights were violated by the EAC's refusal to change the instructions. In addition, the Court dismisses Plaintiffs' Motion for Preliminary Injunction (Doc. 16) as moot.

**IT IS ACCORDINGLY ORDERED** on this 19th day of March, 2014, that the Plaintiffs' Motion for Judgment (Doc. 139) is hereby **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. 16) is **DENIED** as moot.

**IT IS SO ORDERED**.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[115] *See* 5 U.S.C. § 706(1).